FILED
2020 Oct-15  PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. 3:17-CV-01344-CLS |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | |
| ALABAMA, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF OPINION

This suit was filed by a female student at the University of North Alabama who is identified throughout the pleadings by the pseudonym "Jane Doe," and who contends that she was sexually assaulted by one of her Professors while participating in an intercollegiate competition in Orlando, Florida. She sued the University under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and alleged that she suffered discrimination "as a result of the acts, omissions and deliberate indifference"[1] of the University's administrators,[2] after those officials

---

[1] Doc. no. 32 (Second Amended Complaint), ¶ 1 ("The Plaintiff, Jane Doe, asserts a cause of action as a result of the acts, omissions and deliberate indifference of The University of North Alabama . . . to sexual misconduct of a student [*sic*] at the hands of a teacher . . . ." (ellipses and alteration supplied).

[2] *See id*. ¶ 80 ("Dr. Jerome Gafford, [Director of the University's Center for Professional Selling,] Dr. Jana Beaver [Chair of its Department of Management and Marketing,] and the Title IX Coordinator, Tammy Jacques were 'appropriate persons' pursuant to Title IX at UNA and all had actual knowledge/notice of the sexual misconduct of Doe by Dickerson.") (alterations supplied).

had been told of the acts of "sexual harassment and sexual assault" committed by her Professor.[3]  She also asserts claims under 42 U.S.C. § 1983 against six University administrators in their official and individual capacities for deprivation of her Fourteenth Amendment right to equal protection of the laws:  *i.e.*, Dr. Kenneth D. Kitts, President of the University of North Alabama; Dr. Jana Beaver, Chair of its Department of Management and Marketing; Tammy W. Jacques, Title IX Coordinator; Catherine White, Assistant Vice President of the Department of Human Resources and Deputy Title IX Coordinator; Gregory A. Carnes, Dean of the College of Business; and, Dr. John Thornell, Vice President for Academic Affairs and University Provost.[4]  The following discussion addresses the motion for summary judgment filed jointly by all defendants.[5]

---

[3] *Id*. ¶ 83 ("As a result of UNA's deliberately indifferent response to Doe's sexual harassment and sexual assault by a UNA Professor and UNA's self-serving actions to protect UNA, Doe was proximately caused to be excluded from and denied participation in the educational opportunities provided by UNA.").

[4] NOTE:  Plaintiff's original and Second Amended Complaints also alleged claims against two additional University officials:  Dr. David Shields, Vice President of UNA's Department of Student Affairs; and Dr. Jerome Gafford, Director of the Univerisy's Center for Professional Selling. *See* doc. no. 1 (Complaint), ¶¶ 50 & 62; doc. no. 32 (Second Amended Complaint), at, *e.g.*, 16-17, 21.  However, plaintiff subsequently dismissed her claims against those defendants. *See* doc. no. 112 (Stipulation of Dismissal of David Shields and Jerome Gafford); doc. no. 113 (Order Dismissing Fewer than All Defendants).

[5] *See* doc. no. 114 (Motion for Summary Judgment); doc. nos. 115 & 118 (Evidentiary Material in Support of Motion for Summary Judgment); doc. no. 116 (Brief in Support of Motion for Summary Judgment); doc. no. 135 (Response in Opposition to Motion for Summary Judgment); doc. no. 136 (Brief in Opposition to Summary Judgment); doc. nos. 138 & 147 (Evidentiary Material in Opposition to Summary Judgment); doc. no. 152 (Reply in Support of Summary Judgment).

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if

# I.  SUMMARY OF RELEVANT, UNDISPUTED FACTS

"Jane Doe" transferred to the University of North Alabama ("UNA" or "the University") from the Northwest Shoals Community College at the beginning of the Fall semester in 2014.[6]  She declared a major in the subject of Marketing, with a concentration in Sales.[7]  During October of the following academic year, she was selected to be one of four students representing UNA at an intercollegiate sales conference and competition hosted by Florida State University in Orlando from

---

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Supreme Court added a gloss to that language in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), holding that summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921 (alteration and emphasis supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

[6] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 59, 77 (sealed).

[7] *See id.* at 78.

3

Wednesday, November 4, through Sunday, November 8, 2015.[8] She then was twenty-one years of age.[9] The remaining students comprising UNA's team included another female, "A.D.," and two males, "J.B." and "A.K."[10]

Dr. David Dickerson, a Professor of Sales who was "new to UNA" and "taught courses from a 'real world' perspective," assisted in coaching the students in preparation for "the sales management case aspect" of the competition,[11] and traveled to Orlando with the students.[12]

Jane Doe and J.B. competed in separate, individual events on Thursday, November 5, 2015.[13] The following morning, Doe walked to the hotel swimming

---

[8] *See* doc. no. 115-3 (Tab C-1 - Exhibit 13 to Plaintiff's Deposition), at 33 (Competition Agenda); doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 5 (sealed).

[9] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 23-24 (sealed).

[10] The actual names of the students comprising UNA's team to the Orlando intercollegiate competition are disclosed at various points in the sealed record (*see*, *e.g.*, *id.* at 92), but the names of these team members are, in accordance with the parties' agreed protective order (doc. no. 101, at ¶ 3(e)), uniformly referred to in the pleadings by the initials set out in text.

[11] Doc. no. 115-32 (Tab Q- Declaration of Jerome Gafford), ¶ 3.  Dr. Jerome Gafford, Director of the University's Center for Professional Selling, was the primary coach of UNA's team in preparation for the competition.  *See id.*

[12] *Id.* ¶ 6 (recording that, a few days before the Orlando competition, Dr. Gafford was scheduled to move his family into a new home, but construction delays and contractor issues required him to forego travel to Orlando.  He "did not see [that] as an issue for the students since they were all adults," and he "did not know of any reason why [Dr. David] Dickerson should not travel with the students without [him].") (alterations supplied).

[13] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 90-91 (sealed); doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 9 (sealed).  *See also* doc. no. 147-3 (Plaintiff's Exhibit 4 - ICSC Roster), at 2 (sealed).

pool.[14]   Professor Dickerson joined her.[15]   Dickerson moved close to Doe (she described his proximity as "too close"), pulled her towards himself,[16] and touched her legs.[17]   Doe said that she pushed him away and moved from the pool to the hot tub, but Dickerson followed her there;[18] and even though Doe "kept scooting away from" Dickerson, he continued to rub her legs.[19]

Meanwhile, A.K. and J.B. — who shared a hotel room that overlooked the swimming pool and hot tub — observed Doe and Dickerson through their window.[20]

---

[14] *Note*:  Doe *alleged in her complaint* that she walked to the pool after completing her competition event on *Thursday, November 5*, 2015 (doc. no. 32 (Second Amended Complaint), ¶ 27), *but subsequently testified* that the events at the pool that are described in the text following this note occurred on the morning of the following day, *Friday, November 6, 2015*.  Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 113-14, 130 (sealed).  The testimony of the male members of UNA's team also placed the events that occurred in the hotel pool as occurring on Friday, November 6, 2015.  *E.g.*, doc. no. 118-8 (Tab E-5 - Exhibit 12 to the Deposition of Catherine White) at 7 (Report of Meeting with A.K.) (sealed); *id.* at 15 (Exhibit 15 - Report of Meeting with J.B.); doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 10 (sealed).

[15] *Note also that*:  Doe's complaint alleged that she walked to the pool alone (doc. no. 32 (Second Amended Complaint), ¶ 28), but she subsequently testified that she could not recall whether she walked there with Professor Dickerson.  Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 114-15 (sealed).

[16] Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 115-16 (sealed).

[17] *Id*. at 120.

[18] *Id.* at 122.

[19] *Id*. at 124.  Doe could not recall how long she spent in either the pool or hot tub.  *Id.* at 116-17, 124-25.

[20] *See* doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 10 (sealed).

A.K. described them as "making out."[21]  He took photographs.[22]

J.B. later asked Doe whether she was "okay" with what Professor Dickerson had done, but she rebuffed him — describing Dickerson's actions as "not a big deal," saying that it was "her life," and asking J.B. and A.K. to not report the incident.[23] When Doe learned that A.K. had taken photographs of her and Professor Dickerson in the pool and hot tub, she begged him to delete them.[24]

The following Saturday evening, November 7, 2015, Professor Dickerson accompanied Doe and A.D. to dinner.[25]  At some point, A.D. left the restaurant, "saying [that] she was going to go to the room and then come back," but she never returned.[26]  Meanwhile, Doe and Professor Dickerson waited for her at an Irish Pub that was next door to the restaurant.[27]  Dickerson ordered drinks, but Doe began feeling unwell after only "a couple of sips," and asked Dickerson to take her back to

---

[21] *See, e.g.*, doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 4; doc. no. 118-8 (Tab E-5 - Exhibit 12 to the Deposition of Catherine White), at 7 (Report of Meeting with A.K.) (sealed).

[22] *See* doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 11 (sealed); *see also* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 128 (sealed).

[23] Doc. no. 118-11 (Tab F - Declaration of J.B.), ¶ 12 (sealed).

[24] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 130-32, 146 (sealed).  Doe was not shown any of the photographs at that time.  *Id*. at 134.

[25] *See id.* at 151.

[26] *Id.* at 206.

[27] *See id.*

6

her room.[28]  She testified:

> I was feeling very out of it and I know that we walked across the street
> and we sat in front of the hotel on the curb because I didn't feel well.
> And things begin [*sic*] to get very fuzzy there.  I remember at — I
> remember that we were walking, I thought he was taking me to my room
> and I was in and out of it.  *And I remember waking up, coming to in his
> room*.

Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 206-07 (sealed) (emphasis

supplied).

On Tuesday, November 24, 2015 — a little over two weeks after the UNA team

returned from Orlando — a student who had not attended the intercollegiate

competition reported to Dr. Jerome Gafford, an Assistant Professor in UNA's

Department of Management and Marketing,[29] that there may have been inappropriate

contact between Professor Dickerson and one of the female students during the trip.[30]

---

[28] *Id*.  Doe alleged in her complaint that Dickerson had "drugged her" with a date rape drug
(doc. no. 32 (Second Amended Complaint), ¶ 46), but testified that she has no evidence of that.  *See*
doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 206 (sealed) ("Q. Okay.  And is it your contention
he gave you a drug?  A.  I don't recall."); *id*. at 207 ("Q.  So the idea of a date rape drug, you really
don't have any evidence of that, do you?  A.  No, I don't.").

[29] *See supra* notes 11 & 12 (explaining that Dr. Gafford had been the primary coach of
UNA's team in preparation for the intercollegiate conference and competition, but construction
delays and contractor issues prevented him from traveling to Orlando).

[30] *See* doc. no. 115-32 (Tab Q - Declaration of Jerome Gafford), ¶ 7 ("I heard nothing about
the events recounted in the Amended Complaint until November 24, 2015, when a student who was
in the Sales Program but who had not attended the competition reported to me what he had learned
from the two male students who had gone on the trip.  He told me that the male students had planned
not to report what they had observed until after the semester was over.  When they shared what they
knew with the third student, he insisted that the matter be reported and brought the issue to me.").

*Note*: Two days after Doe returned from Orlando, she reported the events that occurred in
Professor Dickerson's hotel room to Jennifer Berry, a counselor at UNA's Student Counseling

Gafford immediately reported the student's statements to his direct supervisor, Dr. Jana Beaver, Chair of UNA's Department of Management and Marketing.[31]  In turn, Dr. Beaver reported the allegations to the University's Title IX Coordinator, Tammy Jacques.[32]  By 9:35 p.m. of that same day, Tuesday, November 24, 2015, Professor Gafford had supplied Ms. Jacques with the names of and contact information for the four students who had comprised UNA's team to the Orlando intercollegiate competition.[33]

Significantly, however, UNA closed for the Thanksgiving holiday earlier that same day, at the conclusion of classes, and was closed through Sunday, November 29, 2015.  Even so, Title IX Coordinator Jacques and Catherine White, UNA's Assistant

---

Services whom Doe had begun to consult approximately one month earlier for unrelated issues, dealing with her then-current romantic relationship.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 84-85, 143-44 (sealed).  *See also* doc. no. 118-2 (Tab C-2 - Exhibit 7 to Plaintiff's Deposition), at 29-45 (Doe's Student Counseling Records) (sealed).  Doe asked Jennifer Berry not to tell anyone about Professor Dickerson, however, and stated that she did not want to report the incident to police, or to UNA.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 160 (sealed) ("Q. . . . And that's what you told Jen Berry, that you did not want to report it to the police, to the school, or anyone, correct?  A.  Correct.  I wanted it to go away.").

[31] *See* doc. no. 115-32 (Tab Q - Declaration of Jerome Gafford), ¶ 7; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶¶ 1, 4.  *See also* doc. no. 118-4 (Tab E-3 - Exhibit 4 to Catherine White's Deposition), at 2 (Nov. 24, 2015 Email from Jana Beaver to Tammy Jacques, Catherine White, and Jerome Gafford, relaying her conversation with Jerome Gafford about the third student's accusations) (sealed).

[32] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 5; doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 5.

[33] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 5; doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 5; doc. no. 115-32 (Tab Q - Declaration of Jerome Gafford), ¶ 7; doc. no. 118-4 (Tab E-3 - Exhibit 5 to the Deposition of Catherine White), at 3-6 (sealed).

Vice President for Human Resources, and a Deputy Title IX Coordinator, discussed the allegations during the Thanksgiving break, and made plans to commence an investigation as soon as students returned to campus.[34]

Thus, Tammy Jacques called Jane Doe's telephone at 10:19 a.m. on Monday, November 30, 2015, and left a voice mail message identifying herself as UNA's Title IX Coordinator, and asking Doe to return her call.[35]  Ms. Jacques then transmitted the following email message to Doe:

> My name is Tammy Jacques, and I am the Title IX Coordinator at UNA. I just left you a voicemail but wanted to reach out to you via email too. A report came to my office, through a faculty member, that you may have experienced an uncomfortable situation with another faculty member recently.
>
> I have attached a brochure for your review.  I may be reached at [phone number].  If you have time today, I would like to meet with you to discuss what might have happened.
>
> I look forward to hearing from you.
>
> Sincerely,
>
> Tammy

---

[34] *See* doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 7; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 78, 91-94 (sealed).  Plaintiff notes, however, that there is no documentation of emails or other communication between Jacques and White in the investigative report.  *See* doc. no. 118-5 (Tab E-4, part 1 - Title IX Investigation Report), at 2 ("November 25-29, 2015 UNA closed for Thanksgiving Break") (sealed).

[35] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 155 (sealed); doc. no. 118-2 (Tab C-2 - Exhibit 16 to Plaintiff's Deposition), at 50 (entry #5 on call log) (sealed); doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 8.

Doc. no. 118-2 (Tab C-2 - Exhibit 18 to Plaintiff's Deposition), at 52 (sealed).[36]

Doe returned Jacques's telephone call at 10:59 a.m. the following morning, Tuesday, December 1, 2015.  She agreed to meet Jacques at 1:30 p.m. that same afternoon.[37]  Less than two hours later, however (*i.e.*, at 12:39 p.m.), Doe called Jacques again and left a voice mail message stating:

> Hi, Ms. Jacques, this is [JANE DOE].  I was just going to call and let you know that something came up and I won't be able to be there at 1:30.  I have to meet with my attorney.  If you just want to give me a call back, we can reschedule it.  I can do it later today or I can call you tomorrow some time or even Thursday even.  Just call me and let me know and we can work something out.  Thanks.  I don't know if you kept my number or if you lost it, it was [phone number].  Thanks.  Bye.

Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 156-57 (sealed); *see also* doc. no. 118-2 (Tab C-2 - Exhibit 16 to Plaintiff's Deposition), at 50 (entries #28 and #29 on

---

[36] A PDF copy of a Title IX brochure was attached to Ms. Jacques's email.  That document provided resources and contact information for reporting Title IX complaints to the University's police and Student Counseling Services (which is identified as a confidential resource).  *See* doc. no. 118-2 (Tab C-2 - Exhibit 18 to Plaintiff's Deposition), at 52-72 (sealed).  The Title IX policy also explicitly stated that the University reserved the

> sole discretion and the right to take whatever measures it deems necessary in response to an allegation of sexual misconduct, dating/domestic partner violence, or stalking in order to protect students' rights and personal safety and the University community.  Such measures include, but are not limited to, *no contact orders*, modification of living arrangements, reassignment of classes as available or removal from classes, interim suspension from campus pending an administrative resolution, and reporting the matter to the law enforcement.

*Id.* at 57 (emphasis supplied).

[37] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 155 (sealed); doc. no. 118-2 (Tab C-2 - Exhibit 16 to Plaintiff's Deposition), at 50 (entry #24 on call log) (sealed); doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 9.

call log) (sealed).

Ms. Jacques returned Doe's call at 4:15 p.m. that same afternoon, but Doe stated — contrary to her voice mail message — that she no longer wanted to meet,[38] and, she did not want a report to be filed.[39]

Despite Doe's reluctance to participate in an investigation, Jacques independently proceeded to conduct one.[40]  She assigned the primary responsibility for leading the investigation to Deputy Title IX Coordinator Catherine White on December 1, 2015:  the same day that Doe cancelled her meeting with Jacques.[41]

One of Ms. White's first steps was to request that Dr. Jana Beaver, Chair of

---

[38] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 160 ("I decided ultimately that I wasn't going to meet with her. . . . I wanted it to go away.") (sealed).

[39] *See id.* at 184 ("Q.  Did you want the University or any of the individual defendants to force you to pursue your Title IX complaint?  A.  No."); *see also* doc. no. 118-2 (Tab C-2 - Exhibit 16 to Plaintiff's Deposition), at 51 (entry #7 on call log) (sealed); doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 9.

[40] *See* doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 10.  Catherine White stated in her deposition:

> Absolutely.  We moved forward with an investigation starting the 30th with a party that did not want to report.  We didn't stop there.  We talked to two other students.  We talked to the professor involved.  We attempted to reach the other student.  And within a week he was non-renewed and told he couldn't come back to campus.

Doc. no. 118-3 (Tab D - Deposition of Catherine White), at 230-31 (sealed).

[41] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶¶ 1, 3; doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 10.  As recorded in the text accompanying note 34, *supra*, Catherine White served UNA in two capacities:  *i.e.*, as Assistant Vice President of its Department of Human Resources, and also as a Deputy Title IX Coordinator.

UNA's Department of Management and Marketing, record the then-current grades of each of the students in Professor Dickerson's classes who had attended the Orlando intercollegiate competition, to ensure that any retaliatory attempts to change grades might be avoided when Dickerson learned of the University's investigation.[42]  Dr. Beaver arranged for the capture of the grades, and also determined that the final assignments and examinations would be graded either by a Teaching Assistant, as opposed to Professor Dickerson, or auto-graded by a computer.[43]

Catherine White then arranged to interview A.K. on the afternoon of December 2, 2015.[44]  He reported that, on the morning of Friday, November 6, 2015,

---

[42] *See* doc. no. 118-3 (Deposition of Catherine White), at 187 (sealed); doc. no. 115-9 (Tab E-1 - Exhibit 2 to the Deposition of Catherine White), at 25 (Defendants' response to Interrogatory No. 16, stating defendant requested that Dr. Beaver make a record of the current grades on December 2, 2015); doc. no. 118-6 (Tab E-4, part 2 - Exhibit 6 to the Deposition of Catherine White), at 22 (Dec. 2, 2015 Email from White to Beaver asking her to make a record of the students' current grades in Dickerson's class) (sealed).

[43] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 7; doc. no. 118-6 (Tab E-4, part 2 - Exhibit 6 to the Deposition of Catherine White), at 22 (Dec. 2, 2015 Email from Beaver to White confirming grade capture) (sealed).  On December 7, 2015, however, J.B. warned Ms. White that the final exam was not going to be automatically graded by a computer.  *See* doc. no. 147-9 (Plaintiff's Exhibit 9), at 2 (Text Message from J.B. to Ms. White) (sealed).  Ms. White responded that she had just learned the same fact, but that Dickerson's Teaching Assistant — and not the Professor — was supposed to grade the exams.  *Id.*

[44] Catherine White sent the following text message to A.K. on December 2, 2015:

[A.K.], my name is Catherine White, and I am the Assistant Vice President for Human Resources at UNA.  I am also a Deputy Title IX Coordinator.  I have been made aware that you may have witnessed an incident between a faculty member and a fellow student that has given you cause for concern.  I would like to discuss this with you.  I am aware that you may want to wait until final grades are submitted before you speak with me.  While I understand your concern, I think it is important that we not wait to meet.  I can, however, give you my word that the University will

as he was preparing for his part of the intercollegiate competition, he observed through his hotel room window that Professor Dickerson and Jane Doe were "making out" in the pool.[45]   He woke his roommate, J.B., and asked him to look at their actions.  A.K. then took some photographs of Doe and Dickerson, but shared only one with Ms. White.  Doc. no. 118-6 (Tab E-4, part 2 - Exhibit 6 to the Deposition of Catherine White), at 20.  While the faces of the persons depicted in that photograph are not clearly visible, their bodies are pressed together, and the legs of one person are spread wide apart, allowing close contact with the torso of the other.[46]

A.K. told Ms. White that, when Professor Dickerson learned that he had taken photographs of him and Doe in the pool, he showed up at the hotel room shared by A.K. and J.B., and asked A.K. to delete the images (which Dickerson mistakenly

---

not take action with regard to the faculty member until after grades are submitted. Would you be willing to meet with me this week?  If so, what day/time will work for you?

Doc. no. 118-8 (Tab E-5 - Exhibit 11 to the Deposition of Catherine White), at 5-6 (sealed).  *See also* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 117 (sealed); doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 4; doc. no. 118-8 (Tab E-5 - Exhibit 12 to the Deposition of Catherine White), at 7-8 (Report of Meeting with A.K.) (sealed).

[45] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 4; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 118 (sealed); doc. no. 118-8 (Tab E-5 - Exhibit 12 to the Deposition of Catherine White), at 7 (Report of Meeting with A.K.) (sealed).

[46] *See* doc. no. 118-6 (Tab E-4, part 2 - Exhibit 6 to the Deposition of Catherine White), at 19-20 (Email from A.K. to Catherine White, attaching photograph) (sealed).  When the photograph was shown to Doe during her deposition, she could not determine whether she and Professor Dickerson were the persons depicted.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 128-29 (sealed) ("I do not confirm nor deny it.").

believed to be videos).[47]  Dickerson acknowledged to A.K. and J.B. that "something"

had occurred in the pool, but added, "You know how things can happen."[48]

Strangely, Dickerson also displayed one of J.B.'s test papers; and, despite the fact that

corrective markings were clearly visible, the paper bore a grade of "100."[49]  A.K.

interpreted that unusual event as Dickerson's attempt to "bribe" J.B.'s silence.[50]  A.K.

also told Ms. White that Professor Dickerson had made inappropriate sexual

comments and jokes at dinner on the first night of the team trip to Orlando.[51]

Ms. White met with J.B. the following day, December 3, 2015.[52]  He

corroborated A.K.'s account of seeing Doe and Dickerson kissing and "making out"

---

[47] *See* doc. no. 118-8 (Tab E-5 - Exhibit 12 to the Deposition of Catherine White), at 7 (Report of Meeting with A.K.) (sealed).

[48] *Id.*

[49] *See id.*

[50] *Id.*

[51] *See id.*  J.B. corroborated this assertion.  He later told Ms. White that Dickerson had made inappropriate comments throughout the Orlando competition, and that he had done so in the classroom prior to the trip as well.  Dickerson's comments included suggesting that "he could get with students, but that he was a state employee," and asking Jane Doe such personal questions as when she started her period, and whether she had been intimate with her girlfriend.  Doc. no. 118-8 (Tab E-5 - Exhibit 15 to the Deposition of Catherine White), at 15-16 (Report of Meeting with J.B.) (sealed).

[52] Ms. White initiated the meeting by sending J.B. a text message that was identical to the one she previously sent to A.K.  *See* note 44, *supra*, and, doc. no. 118-8 (Tab E-5 - Exhibit 14 to the Deposition of Catherine White), at 12-13 (Dec. 3, 2015 Text Messages between White and J.B.) (sealed).  J.B. agreed to do so later that day.  *See id.* at 13-14 (confirming meeting at 3 p.m. on December 3, 2015).

in the hotel pool.[53]  He also observed them in the hot tub, and said that Dickerson

pulled Doe toward him.[54]  He confirmed that Dickerson had appeared at their hotel

room, and asked A.K. to delete any photographs he may have taken.[55]  J.B. and A.K.

were so uncomfortable after the unannounced meeting that they departed for the

Orlando airport eight hours early on the day they were scheduled to leave, to avoid

having to again confront Dickerson.[56]  After returning to the UNA campus, J.B.

continued to attend Dickerson's class, but he noted that Jane Doe ceased to do so.[57]

Ms. White also reached out to A.D., the other female student on UNA's team,

but she never responded to White's request for a meeting.[58]

White was unsure whether the statements obtained from A.K. and J.B.

established a Title IX violation, but she believed that Professor Dickerson's behavior

violated the University's policy forbidding sexual relationships between a Professor

and a student directly supervised by that faculty member, even if the relationship was

---

[53] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 4; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 143 (sealed).

[54] Doc. no. 118-8 (Tab E-5 - Exhibit 15 to the Deposition of Catherine White), at 15 (Report of Meeting with J.B.) (sealed).

[55] *See id.*

[56] *See id.*

[57] *See id.* at 16.  Following their respective interviews, A.K. and J.B. were each allowed by Catherine White to review and approve copies of their respective written statements.  *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 244 (sealed).

[58] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 117, 143, 167 (sealed); *see also* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 6.

consensual.[59]

Consequently, Ms. White, Dr. Beaver, and Gregory Carnes, Dean of the College of Business, interviewed Professor Dickerson five days later, on Tuesday, December 8, 2015.[60] Dickerson initially denied understanding what they were asking him about, but eventually he said:

> I think I may know what you are talking about.  At some point [Jane Doe] came over to me and said that the male students were taking pictures or videos of us from their room and that we needed to give them something to look at.  She got closer to me for a second, and I told her we didn't need to do that.  It was a joke; it was only for a second.  I believe we were in the hot tub at the time.  She also told me something that I told her I probably needed to disclose.  She said that one of the male students on the trip had previously tried to rape her and that the other student had been unable to keep his hands off her while on the trip.  I knew it was important for me to disclose this information; I know about Title IX, but she didn't want me to.

Doc. no. 118-9 (Tab E-6 - Exhibit 18 to the Deposition of Catherine White), at 10 (Report of Meeting with Dickerson) (sealed).  Dickerson contradicted J.B. on one point, however, and insisted that Jane Doe had been attending his classes since

---

[59] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 5; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 161-64 (sealed).  *See also* doc. no. 115-28 (Tab M - Exhibit A to the Declaration of Tammy Jacques), at 22-24 (UNA Policy on Consensual Relationships).

[60] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 8; doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶ 1, 3; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 8; *see also* doc. no. 118-9 (Tab E-6 - Exhibit 18 to the Deposition of Catherine White), at 9 (Report of Meeting with Dickerson) (sealed).  Prior to the meeting, Ms. White requested that an officer be present in the building because she was unsure how Dickerson would react.  *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 188-92 (sealed).

returning from the Orlando trip.[61]

At the conclusion of the meeting, Ms. White directed Dickerson to not contact any of the students who had comprised UNA's team to the Orlando intercollegiate competition, and told him that she would be in touch as soon as possible regarding how the events might affect his employment.[62]

Immediately following their interview with Dickerson, Ms. White, Dr. Beaver, and Dean Carnes discussed the continuing need to speak with Jane Doe, to obtain her account of the events that had occurred in Orlando.[63]

---

[61] *See* doc. no. 118-9 (Tab E-6 - Exhibit 18 to the Deposition of Catherine White), at 11 (Report of Meeting with Dickerson) (sealed).  As noted previously, J.B. claimed that Doe stopped attending Dickerson's class. *See* doc. no. 118-8 (Tab E-5 - Exhibit 15 to the Deposition of Catherine White), at 16 (Report of Meeting with J.B.) (sealed).

[62] *See* doc. no. 118-9 (Tab E-6 - Exhibit 18 to the Deposition of Catherine White), at 12 (Report of Meeting with Dickerson) (sealed); *see also* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 8; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 187 (sealed). Dickerson was allowed to review and approve a written summary of his statements. *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 244 (sealed).  Later that evening, Dr. Beaver received a text message from Professor Dickerson saying that he was "quite upset" with the meeting, but he backed down when Dr. Beaver said she was not allowed to discuss the issue with him.  *See* doc. no. 118-9 (Tab E-6 - Exhibit 20 to the Deposition of Catherine White), at 16 (Dec. 8, 2015 Email from Dr. Beaver to Ms. White and Dean Carnes relaying text message exchange with Dickerson) (sealed).

[63] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 9; doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 9; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 175 (sealed).  The group also discussed the need to again attempt to contact "A.D.", the other female student on UNA's team to the Orlando intercollegiate competition.  *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 9; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 9.  Nevertheless, all attempts to contact and interview her proved futile.  For example, at the conclusion of Dr. Beaver's December 9, 2015 interview of Jane Doe, Beaver asked Doe if she could convince "A.D." to talk with her, but Doe said that A.D. was "having her own problems and probably didn't want to get involved."  Doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 21 (Report of Dr. Beaver's Interview with Jane Doe) (sealed).  Even so, Dr. Beaver still attempted

Due to Jane Doe's previous refusal to meet with Title IX Coordinator Tammy Jacques, the group discussed the possibility of having Dr. Jana Beaver attempt to interview her because, as Department Chair and a professor in the Business College, Doe likely was more familiar with Dr. Beaver.[64]  However, Dr. Beaver was not a Title IX investigator.  Even so, Tammy Jacques believed that Beaver "might have some success in reaching" Doe, and so Jacques agreed that Beaver should make the attempt, because she "was concerned that was the only way [they] could get Jane Doe to talk to a University official."[65]

In preparation for the attempt, Catherine White reviewed UNA's Title IX policies with Dr. Beaver, and provided her with a list of questions to use if she succeeded in interviewing Doe.[66]  Ms. Jacques also provided Dr. Beaver with copies of UNA's Title IX pamphlet and brochures to give to Doe when she met with her.[67]

---

to contact "A.D.", but was not successful.  *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 11.

[64] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶¶ 9, 12; doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 9; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 175, 206-07 (sealed).

[65] Doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 17 ("I agreed that even though Dr. Beaver was not a Title IX investigator, I thought she might have some success in reaching [Doe] because the student had some familiarity with Dr. Beaver as Department Head for the Management and Marketing department.") (alteration supplied).

[66] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 206 (sealed); doc. no. 118-9 (Tab E-6 - Exhibit 23 to the Deposition of Catherine White), at 19 (list of questions Ms. White sent to Dr. Beaver) (sealed).

[67] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 12; doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 18.

18

Later that same day (Tuesday, December 8, 2015), Dr. Beaver sent the following text message to Jane Doe:

> [Jane], this [is] Dr. Beaver.  The HR Director, Dean, and myself met with Dr. Dickerson this afternoon about the situation.  He has been instructed not to contact any of the four of you during the investigation.  Please ignore any texts, calls, or emails from him.  We have multiple grade reports from your class so we will know if he tries to change a grade.  I understand that you didn't meet with the Title IX Coordinator when she wanted to speak with you and that's okay.  We know you are scared.  Protecting the students in my department is so very important to me.  I am very upset over this situation.  Will you please talk to me and/or Mr. Gafford if that makes you more comfortable?  We need more statement/evidence in order to protect students in the future and to protect you!  We don't have to meet on campus.  Please respond.

Doc. no. 118-9 (Tab E-6 - Exhibit 17 to the Deposition of Catherine White), at 2-3 (Text Messages Between Dr. Beaver and Doe) (sealed) (alterations supplied).

Doe responded that same day, saying "I can come talk to you tomorrow if you are available?"[68]  Dr. Beaver replied affirmatively:

> Yes, thank you!  I'm free anytime except 9:30-10:30 and 12:30-1:30.  I do not want you in our [building] tomorrow unless you have a final in the morning.  I have some other locations on campus where we can meet to avoid him seeing us if he happens to be working in his office.  Do you want it to be just the two of us in the meeting?

Doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 10 (alteration supplied).  Doe responded to Beaver's email, saying:  "I would prefer it to be just the two of us if

---

[68] *See* doc. no. 118-9 (Tab E-6 - Exhibit 17 to the Deposition of Catherine White), at 3 (Text Messages Between Dr. Beaver and Doe) (sealed).

that's okay.  Would you be able to meet at 2?"[69]  Beaver agreed, saying:  "That's perfectly fine.  2:00 is good.  I'll text you tomorrow morning when I have a space for us to meet.  I know this takes a lot of courage, and I really appreciate you being willing to talk to me."[70]

Dr. Beaver and Doe met as agreed on Wednesday, December 9, 2015.[71]  Beaver took notes during the initial part of the interview,[72] but ceased doing so when she sensed that it was making Doe anxious.[73]

It was during their conference that Doe first reported that Professor Dickerson had touched her sexually during the night she was in his hotel room.[74]  She said that she remembered lying down with Dickerson in his hotel room; and that, after a while,

---

[69] *Id.*

[70] Doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 10, Ex. A.

[71] *Id.* ¶ 13.  Doe testified during deposition that Dr. Jana Beaver was "the only person [she] felt comfortable talking to[,] considering it was such a traumatic experience for [her]."  Doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 164 (sealed) (alterations supplied).

[72] *See* doc. no. 147-2 (Plaintiff's Exhibit 3 - Dr. Beaver's Handwritten Notes) (sealed).

[73] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 207 (sealed); doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 20-22 (Report of Dr. Beaver's Interview with Jane Doe) (sealed).  At one point, Dr. Beaver became afraid that Doe might leave the interview, and begged her to stay.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 208 (sealed).

[74] *See* doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 21 (Report of Dr. Beaver's Interview with Jane Doe) (sealed).  Doe testified that all of the information in Dr. Beaver's interview report is correct except the temporal order of going to the hot tub and then the pool, and that Doe was working on "A.D."'s presentation rather than her own.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 263-65 (sealed).

he began to "touch" her.[75]  He used his fingers to penetrate her vagina.[76]  She did not

then, nor later, contend that he had raped her.[77]

---

[75] Dr. Beaver's interview report of that incident states in full:

> [Doe] next discussed having lots of drinks with Dr. Dickerson and them getting back to the hotel and sitting outside on a bench/chairs for a long time. She said she was drunk. It was in the middle of the night at this point and she said she didn't have a room key for her room so they went to Dr. Dickerson's hotel room. She said they laid down. She said that after awhile he was touching her, but I had to get specific in my questioning when she stopped talking about the matter. I asked if they had sex and she said No. I asked if he put his penis in her mouth and she said no. I asked if he put his fingers in her vagina and she said yes. I asked a different repetitive question to ascertain if they had sex. Did he put his penis in your vagina? No. She said it was like he was being very careful not to do that because he knew he could get in trouble. . . . She said, I told you more than I was going to tell you. I was only going to talk about the picture. I asked her was there more that she hadn't told me. She stated that this was it.

Doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 21 (Report of Dr. Beaver's Interview with Jane Doe) (sealed). The only part of this account that Doe confirmed during her deposition was that Dickerson had used his fingers to sexually penetrate her vagina. *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 206-08 (sealed).

[76] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 208 (sealed).

[77] Doe affirmed during her deposition that she did not contend that Professor Dickerson had raped her.

> Q. We talked about this a little bit before. I just want to confirm that your answer has not changed. You're not alleging rape in your lawsuit*? You're alleging sexual assault, but you're not alleging rape*, is that correct?
>
> A. That is what I said, yes.
>
> Q. Okay. And do you recall reporting to Jana Beaver [Chair of UNA's Department of Management and Marketing] that he [Professor Dickerson] used his hands to allegedly assault you?
>
> A. I do remember saying that, yes.

*Id.* (emphasis and alterations supplied).

Doe said that she had ceased attending Dr. Dickerson's class after returning from Orlando, but he had "contacted her later in November[, inviting her] to go get a drink before he left town for Thanksgiving[, but] she ignored it."[78]

Doe told Dr. Beaver that she did not want Dickerson "to lose his job over this; she just wanted it to go away."[79]   Doe also asked Beaver if she thought Dickerson "would try to kill her if he found out she had talked":  a question that provoked Beaver to ask whether Doe "was asking for protection"?[80]  Doe essentially answered no, by responding that "she just wanted to go on like nothing happened," and "did not want [UNA] to do anything and did not want to press charges."[81]

Jane Doe had concluded her classes and final exams on the date she met with Dr. Beaver, and she did not reside on campus.[82]   Consequently, Dr. Beaver recommended that she stay off campus until the University officially closed on Saturday, December 12, 2015, in order to minimize any chance of running into Dr.

---

[78] Doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 21 (Report of Dr. Beaver's Interview with Jane Doe) (alterations supplied) (sealed).

[79] *Id.* at 22.

[80] *Id.*

[81] *Id.* (alteration supplied).

[82] *See* doc. no. 118-2 (Tab C-2 - Exhibit 4 to Plaintiff's Deposition), at 7-8 (Plaintiff's response to the interrogatory requesting her addresses for the last five years, showing she never resided on campus at UNA) (sealed).

Dickerson.[83]  Beaver also recommended that Doe use the "buddy system" when in downtown Florence, and any other areas in which UNA had no control over Dickerson's movements.[84]

Later, at 7:50 p.m. that same evening, Doe sent the following text message to Dr. Beaver:  "Hey Dr. Beaver, I just wanted to let you know that I was just informed that Dr. Dickerson is having a Christmas party with his . . . class this evening at Flobama.  Sorry to bother you, I just thought you might should know."[85]  Dr. Beaver thanked Doe for the note, and added that she was aware that another one of the students who represented UNA at the Orlando competition also was in the class, and that she intended to "contact that student [and] request [that he not attend]. Remember to go places with others over the next few days.  Thanks again for coming today!"[86]

---

[83] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 15; *see also* doc. no. 115-25 (Tab J-2 - Academic Calendar for the Fall Semester of 2015), at 4 (showing that exams ended on December 9, 2015, and campus closed on December 12, 2015).  Plaintiff claims, however, that she was banned from campus.  *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 172 (sealed).

[84] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 16; doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 172 (sealed).  After the meeting with Doe, Dr. Beaver said that she reported Doe's statements to Tammy Jacques and Catherine White, and added that Doe did not want to participate further in the investigation.  *See* doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 18; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 208-09 (sealed).  Plaintiff notes, however, that there is no documentation of such a meeting in the Title IX Investigation Report.  *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 209 (sealed).

[85] Doc. no. 115-27 (Tab L - Exhibit 2 to the Declaration of Jana Beaver), at 18 (Text Messages between Jane Doe and Dr. Jana Beaver at 7:50 p.m. on Dec. 9, 2015).

[86] *Id*. (alterations supplied).  Jane Doe replied at 10:55 a.m. of the following day, December 10, 2015:  "Will do.  And you're welcome!"  *Id*.

Ms. White reiterated the "no contact" orders she had verbally delivered to

Professor Dickerson on Tuesday, December 8, 2015, in the following email, sent to

him three days later, on Friday, December 11, 2015:

> Dr. Dickerson:
>
> This communication is being sent as a follow-up to our conversation on Tuesday, December 8.  This serves to provide you official written notice that, effective immediately, you are not permitted to contact, speak to, send email or any other form of electronic communication to, make any gestures toward, or send any hand written communication to/with the following students:  [REDACTED].
>
> If you are in the same physical location as any of these students, you may not make contact.  Should you disregard this No Contact Order, you will be subject to disciplinary action from the University for failing to comply with this directive.  . . .

Doc. no. 115-29 (Tab N - Exhibit B to the Declaration of Catherine White), at 12

(December 11, 2015 Letter from White to Dickerson).[87]

The following Monday, December 14, 2015, Ms. White met with Dr. Jana

Beaver, Dean Gregory Carnes, and Dr. John Thornell, Vice President for Academic

---

[87] Plaintiff notes that the no-contact order Catherine White emailed to Dickerson on December 11, 2015 did not appear on UNA letterhead, and that it did not include White's signature. *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 261-66 (sealed) (where Ms. White acknowledges that the order did not appear on UNA letterhead, and that she did not exactly copy the template that Title IX Coordinator Jacques had give her to use).  *But see id.* at 261 ("Q.  Can you tell me why you didn't sign it?  A.  We typically don't sign the electronic letters or we didn't at that time. We have digital signature technology now.").

Affairs and University Provost, to discuss Dickerson's employment future.[88]  Based on the information outlined above, they determined that Dickerson had violated the University's consensual relationship policy.[89]  They then discussed the option of terminating his employment immediately, as opposed to not renewing his contract when it expired and banning him from campus during the interim, and which of those alternatives would be in the best interests of UNA and its students.[90]  Ultimately, White, Beaver, Carnes, and Thornhill reached a consensus to recommend to the University's President that Dickerson be placed on administrative leave, banned from campus, issued a permanent "no-contact" order, and notified that his employment contract would not be renewed for an additional academic year.[91]  Dr. Thornell and

---

[88] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 13; doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶ 4; doc. no. 115-31 (Tab P - Declaration of John Thornell), ¶ 3; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 19; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 247-49 (sealed).

[89] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 62-66 (sealed).  Ms. White stated during her deposition:

> There was an issue with consent based on that definition [*i.e.*, "A person cannot consent if he or she is unable to understand what is happening or is disoriented, helpless, asleep or unconscious for any reason, including due to alcohol or other drugs"] as well as the definition of a power differential in our consensual relationships policy.  She was his student which complicates consent.

*Id.* at 65 (alteration supplied).

[90] *See id.* at 252-53.

[91] *See id.* at 252-54; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 19; doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶ 5; doc. no. 115-31 (Tab P - Declaration of John Thornell), ¶¶ 3-4.

Dean Carnes presented that recommendation to UNA's President, Dr. Kenneth D.

Kitts, who approved it.  As Dr. Kitts later explained,

> I had the discretion to reject their recommendation and to immediately terminate Dickerson's employment.  I carefully considered the possibility of immediate termination of employment versus the solution that was recommended.  I was concerned that Dickerson would take the position that early termination of his contract would entitle him to a due process hearing where he could respond to and defend against the allegations of sexual misconduct that our Title IX Office had investigated, and to be paid his salary during the hearing process.  A hearing might have necessitated testimony from the students affected by his conduct, which could have been intimidating or emotionally challenging for those students.  It also would have risked exposing the identities of these students, thus implicating the Family Educational and Privacy Rights Act (FERPA).  I was informed that Dickerson had said that, if fired, he intended to file a grievance under UNA's policies and to defend against the accusations, which would have resulted in protracted delays that might have extended beyond May 1, 2016.  I believed that would have presented many contractual ramifications and administrative complications.  My intent in placing Dickerson on administrative leave was to get him off campus quickly and prohibit student contact.  I believed that course of action would lessen the chance of the identities of the students involved becoming public and avoid any emotional impact on those students.  I made the ultimate choice not to immediately terminate Dickerson's employment, but to accept the recommendation to place Dickerson on administrative leave until his contract term expired, because I believed that it protected the best interests of the students involved as well as those of the entire UNA community by removing him from campus while avoiding protracted procedural appeals and potential litigation by Dickerson.

Doc. no. 115-26 (Tab K - Declaration of Kenneth Kitts), ¶ 3.[92]

---

[92] Jane Doe contends that Dr. Kitts's decision to accept the recommendation to place Dickerson on administrative leave through the end of the Spring 2016 semester, and to not renew his existing employment agreement when it was expired at the end of that semester, was made

Catherine White, Dean Carnes, and Dr. Beaver called Professor Dickerson on December 17, 2015, and told him of President Kitts's decision.[93]   Dean Carnes explained that Dickerson was banned from campus for the remainder of his existing employment contract, and that his contract would not be renewed when it expired.[94] Dickerson threatened legal action during that telephone call, but as discussed below, he ultimately agreed to the University's terms.   Later that same day, Ms. White sent an email to Dickerson that attached copies of documents that had been discussed during their telephone call, and which also had been mailed to him *via* certified mail.[95]   The documents included a proposed "Confidential Agreement and Release" to be executed by Dickerson and UNA President Kitts.[96]

---

because it was in the best interest of the University, and had nothing to do with protecting "the best interests of the students involved."  *See* doc. no. 136 (Brief in Opposition to Summary Judgment), ¶¶ 114-18.

[93] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 14; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 20.  Plaintiff notes that the Title IX Investigation Report does not document that phone call.  *See* doc. no. 118-5 (E-4, part 1 - Title IX Investigation Report), at 2-4 (sealed).

[94] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 14.

[95] Doc. no. 118-16 (Tab J-1 - Exhibit A to the Second Declaration of Catherine White), at 2 (Dec. 17, 2015 email from Catherine White to Dr. David Dickerson) (sealed).

[96] The documents attached to White's email included:  (*i*) a Dec. 17, 2015 letter from Dr. Thornell informing Dickerson that he was placed on administrative leave with pay and benefits for the remainder of his existing employment contract, and confirmed the University's decision to not renew his employment contract when it expired on May 14, 2015 (*id*. at 3); (*ii*) a copy of Dickerson's original, June 18, 2015 contract of employment (*id*. at 4-5); (*iii*) a copy of Catherine White's December 11, 2015 written notice that Dickerson was not permitted to contact any of the four students who had comprised UNA's intercollegiate team (*id*. at 6); and (*iv*) a copy of the *proposed* "Confidential Agreement and Release" to be executed by Dickerson and UNA President (*id*. at 7-11).

Dickerson executed the Agreement and Release on January 6, 2016.[97]  Its terms placed him on "Administrative Leave with Pay and Benefits" through the end of his existing employment contract on May 14, 2016,[98] and also provided that:

(a)     Dickerson will perform research duties off campus as assigned by Dr. Gregory Carnes, Dean of College of Business.  During the Research Period, UNA shall employ Dickerson solely for the purpose of conducting research.

(b)     Dickerson's employment shall be governed solely by the terms and conditions of this Agreement.  During the Research Period, Dickerson may represent to others that he is a Visiting Associate Professor of Marketing Research in the College of Business at UNA.

(c)     Dickerson shall have a UNA email account; however, all other UNA computer access will be shut off.

(d)     During the Research Period Dickerson shall not engage in activities as a faculty member or a Marketing Professor on UNA's campus, or at any other UNA facility, and he shall not be entitled to exercise rights of a faculty member, including but not limited to teaching, maintaining an office, evaluating employees, students and faculty, attending UNA seminars and lectures, attending faculty meetings, or any other matter, serving on committees, performing service or outreach activities, entering campus, or making a grievance or invoking other terms of UNA's faculty handbook.

(e)     Dickerson agrees to follow all UNA policies and procedures, including but not limited to the UNA Faculty Handbook and the UNA Employee Relations Procedures and Guidelines.

---

[97] *Id.* at 12-16.

[98] *Id.* at 12.

(f)    Dickerson agrees to follow all local, state and federal laws.

(g)    Dickerson agrees to follow non-retaliation policies towards faculty, staff and/or students.

(h)    Dickerson agrees to have no contact with UNA faculty, staff and/or students except the following: Dickerson may contact Dr. Gregory Carnes for questions regarding research duties and Human Resources and/or Payroll regarding routine compensation and benefits questions.

(i)    Not later than **January 8, 2016, 4:30 pm CST**, Dickerson agrees to vacate his office at UNA and UNA shall have no obligation to finish an office beyond **January 8, 2016, 4:30 pm CST**. Also, no later than **January 8, 2016, 4:30 pm CST**, Dickerson shall turn over to Dr. Gregory Carnes all UNA property including but not limited to all documents, files, and records (whether in electronic or written form), relating to the courses of study that he has taught, including without limitation all student records, and any other property of UNA, such as, without limitation, keys, computer equipment, Mane Card, parking hangtag and furnishings. Beyond **January 8, 2016, 4:30 pm CST**, Dickerson is prohibited from returning to the University of North Alabama's campus.

Doc. no. 118-16 (Tab J-1 - Exhibit B to the Second Declaration of Catherine White), at 12-13 (Agreement Signed by Dickerson on January 6, 2016) (sealed) (**boldface** in original).

Dean Carnes escorted Dickerson to his office, to remove personal effects, on January 8, 2016.[99] UNA Campus police then were informed that Dickerson was not

---

[99] *See* doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶ 7.

to be allowed to return to campus after that date,[100] and he did not do so.[101]  Ms. White

received no additional complaints about Dickerson's behavior while he remained on

UNA's payroll.[102]

Dr. Beaver sent the following text message to Jane Doe later that same day,

informing her that Professor Dickerson would

> not be on campus for the remainder of his contract which expires May
> 14.  He will remain under a no contact order with those students
> involved.  He is coming to campus later this afternoon to clean out his
> office.  I have no idea how long he will be in town or when he plans to
> leave the area for good, but I would say for sure this weekend to again
> make sure you're not by yourself since we know he's back.  The
> university asks that y'all remember the confidentiality of this matter.
> Hope your new year is off to a good start!

Doc. no. 118-2 (Tab C-2 - Exhibit 21 to Plaintiff's Deposition), at 81 (January 8,

2016 Text Message from Dr. Beaver to Jane Doe) (sealed) (alteration supplied).

Jane Doe never demanded Dickerson's immediate dismissal.  In fact, as

previously noted, she told Dr. Beaver that she "didn't really want him [to] lose his job

over this; she just wanted it to go away."  Doc. no. 118-9 (Tab E-6 - Exhibit 24 to the

Deposition of Catherine White), at 22 (Dr. Beaver's Report of Doe Interview)

---

[100] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 285 (sealed).  Plaintiff
notes that there is no documentation that campus police were informed in the Title IX Investigation
Report.  *See* doc. no. 118-5 (E-4, part 1 - Title IX Investigation Report), at 2-4 (sealed).

[101] *See* doc. no. 115-23 (Tab I - Second Declaration of Catherine White), ¶ 5.  Plaintiff notes,
however, that no steps were taken to surveil Dickerson's movements.  *See* doc. no. 118-3 (Tab D -
Deposition of Catherine White), at 220 (sealed).

[102] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 284 (sealed).

(sealed).  Even so, no one with Title IX training ever met with Doe, or explained to her the possible outcomes of an investigation, or what the different methods of terminating Dickerson's employment might mean for her.[103]

Doe testified that Dickerson complied with the no-contact order for the six-month period he remained under contract with UNA.[104]  In fact, he did not attempt to contact her until three months after his employment contract expired in May of 2016:[105] that is, Dickerson sent Doe the following message *via* "LinkedIn" on August 17, 2016:

> It has been over six months since we spoke, so I am sorry!  Much to my dismay, I was compelled by UNA not to speak with anyone!  What crazy, stupid, and parochial minded people.  Either way, I just wanted to say that aside from childish behavior, I command a great respect for you, and will be happy now to keep in touch with you!  Friends forever!  Feel free to contact me!  Your friend, David

Doc. no. 118-17 (Tab S - August 17, 2016 LinkedIn message from Dickerson to Doe), at 2 (sealed).

Doe did not report the foregoing contact to Dr. Jana Beaver until October of 2016, two months after receiving it.[106]  Doe asked Beaver whether she should obtain

---

[103] *See id.* at 206-07, 223-24.

[104] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 239 (sealed).

[105] *See* doc. no. 115-31 (Tab P - Declaration of John Thornell), ¶ 3; doc. no. 118-16 (Tab J-1 - Exhibit A to the Second Declaration of Catherine White), at 2-5 (Dickerson Termination Documents) (sealed).

[106] *See* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 21.

a "restraining order," and Dr. Beaver explained that after Dickerson's employment contract had expired in May of 2016, UNA no longer had a method of controlling his actions.   Consequently, Beaver told Doe that, if she believed that she needed a "restraining order," she should independently attempt to obtain one.[107]

Dr. Beaver retained contact with Doe during the remainder of December 2015, and throughout 2016 and 2017, to assist her with class scheduling.  For example, on December 10, 2015 — the day after Dr. Beaver interviewed Doe about the events that had occurred in Orlando — Dr. Beaver contacted the professor responsible for Doe's Marketing 440 class, and requested his approval for an "Incomplete" grade for the Fall semester.[108]

Dr. Beaver also met with Doe sometime before December 12, 2015, to advise her on Spring semester classes for which she should register, and to tell her that Dickerson would not be on campus during that semester.[109]

On December 14, 2015, Dr. Beaver asked Doe to come to her office the following day for the purpose of working on her Spring class schedule.  She also told

---

[107] *See id.*

[108] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6a (sealed); doc. no. 118-13 (Tab H-1 - Exhibit 1 to the Second Declaration of Jana Beaver), at 3 (Dec. 10, 2015 Email from Dr. Beaver to [Marketing 440 Professor] requesting Doe receive an "I" in the class) (sealed).

[109] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 5 (sealed).  Plaintiff notes that this meeting is not documented in the Title IX Investigation Report.  *See* doc. no. 118-5 (Tab E-4, part 1 - Title IX Investigation Report), at 2-4 (sealed).

Doe that her Marketing 440 professor had approved an "Incomplete" grade for the Fall semester.[110]  The following day, December 15, 2015, Doe met with Dr. Beaver to discuss her schedule for the forthcoming Spring semester.[111]

Two days later, on December 17, 2015, Dr. Beaver sent Doe a text message stating that she had obtained the permits Doe needed for her Spring classes, and that she could pre-register before January 3, 2016, or if she missed that registration window, she could register after January 11, 2016.[112]

Doe contacted Dr. Beaver on January 11, 2016, because she had lost the permit she needed to register for one of her classes.[113]

Even after Professor Dickerson was no longer on campus, Dr. Beaver continued to assist Doe with class scheduling, and with communications to her professors when Doe needed to withdraw from courses.  Doe requested Dr. Beaver's help with registration for the Fall 2016 Semester in the following email:

> I am contacting you because I feel as though I would prefer to talk to

---

[110] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6b (sealed); doc. no. 118-13 (Tab H-1 - Exhibit 2 to the Second Declaration of Jana Beaver), at 4 (Dec. 14, 2015 Text Message from Dr. Beaver to Doe asking her to come by and telling her the "I" grade was approved) (sealed).

[111] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6c (sealed).

[112] *See id.* ¶ 6d; *see also* doc. no. 118-13 (Tab H-1 - Exhibit 2 to the Second Declaration of Jana Beaver), at 5 (Dec. 17, 2015 Text Message from Dr. Beaver to Doe) (sealed).

[113] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6e (sealed); doc. no. 118-13 (Tab H-1 - Exhibit 4 to the Second Declaration of Jana Beaver), at 7 (Jan. 11, 2016 Text Messages Between Doe and Dr. Beaver) (sealed).

you about registration for this fall.  You were so great with helping me before, and I feel better getting back into school with someone who knows why I would want to take mostly online classes.  I took medical leave this passed [*sic*] Spring semester due to the events that happened. I know which classes I need to take, but I would be willing to meet with you if you would prefer to talk me through it instead.  I was hoping to get my code from you either way.  Thank you so much for your time!

Doc. no. 118-14 (Tab H-2 - Exhibit 5 to the Second Declaration of Jana Beaver), at 2 (August 1, 2016 Email from Doe to Dr. Beaver) (sealed).[114]

Later during that same month of August 2016, Dr. Beaver assisted Doe with the paperwork required to receive credit for an internship Doe had acquired for the Fall 2016 semester.[115]

Still later, on November 8, 2016, Doe contacted Dr. Beaver for assistance in making up some course assignments she had missed, stating (in part):  "You've been a really big help to me before and I immediately thought I should come to you for help."[116]

On January 19th of the following, 2017 semester, Dr. Beaver once again contacted Doe's Fall 2015 Marketing 440 professor, because her "Incomplete" grade had turned into an "F," and Beaver requested that the professor give Doe a grade of

---

[114] *See also* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6f (sealed).

[115] *See id.* ¶ 6g; *see also* doc. no. 118-14 (Tab H-2 - Exhibit 6 to the Second Declaration of Jana Beaver), at 3-5 (Aug. 11-16, 2016 Emails between Doe and Dr. Beaver) (sealed).

[116] Doc. no. 118-14 (Tab H-2 - Exhibit 7 to the Second Declaration of Jana Beaver), at 6 (Nov. 8, 2016 Email from Doe to Dr. Beaver) (sealed).  *See also* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6h (sealed).

"C," reflecting the grade she had prior to the incidents in Orlando.[117]  In addition, Dr.

Beaver requested on that same date that Doe be allowed to participate in the Spring

2017 graduation, and Gregory Carnes, Dean of the College of Business, approved the

request.[118]  Even so, Doe did not successfully complete her Spring 2017 course work,

either due to failing grades or untimely withdrawals.  Thus, she was unable to

graduate that semester.[119]  In October of 2017, Dr. Beaver contacted the Registrar to

follow up on changing Doe's grade in Marketing 440 from an "F" to a "C."[120]

Doe was again in a position to graduate at the end of the Fall 2017 semester,

but just before the beginning of the 2017 Thanksgiving break she informed Dr.

Beaver that she was dropping all of her classes.  Dr. Beaver followed up with the

Registrar's Office because only three of Doe's four classes had been successfully

dropped, and she wanted to make sure everything was correct on Doe's record.[121]

Beginning around July of 2019, Dr. Beaver began working to create a degree

path for Doe, including:  replacing her "Fs" with "Ws" (withdrawals), and thereby

---

[117] *See* doc. no. 118-12 (Tab 6 - Second Declaration of Jana Beaver), ¶ 6(i); *see also* doc. no. 118-13 (Tab H-1 - Exhibit 1 to the Second Declaration of Jana Beaver), at 2 (Jan. 19, 2017 Email from Dr. Beaver to Marketing 440 Professor) (sealed).

[118] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6j (sealed); doc. no. 118-14 (Tab H-2 - Exhibit 8 to the Second Declaration of Jana Beaver), at 8 (sealed).

[119] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6j (sealed).

[120] *See id.* ¶ 6k; *see also* doc. no. 118-14 (Tab H-2 - Exhibit 9 to the Second Declaration of Jana Beaver), at 9 (sealed).

[121] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶ 6l (sealed); *see also* doc. no. 118-15 (Tab H-3 - Exhibit 10 to the Second Declaration of Jana Beaver), at 2-3 (sealed).

raising her grade point average from 1.63 to 2.73; providing Doe a partial tuition scholarship; assigning her a female academic advisor; and, giving her the opportunity to complete her course work off-campus, through on-line classes and independent study (which required changing Doe's concentration from Sales to Digital Marketing).[122]  Doe was enrolled at UNA as of June 2, 2020, and then was expected to graduate at the end of the Fall 2020 semester.[123]

## II.  DISCUSSION

### A.     Title IX

Title IX of the Education Amendments Act of 1972 states that:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Although Title IX makes no explicit reference to sexual harassment or abuse, *see id*. at §§ 1681–88, the Supreme Court has determined that such conduct can sometimes constitute "discrimination" in violation of the statute that supports an implied private right of action for damages against a federally-funded educational institution for sexual harassment.  *E.g., Cannon v. University of Chicago*, 441 U.S. 677, 709, 717

---

[122] *See* doc. no. 118-12 (Tab G - Second Declaration of Jana Beaver), ¶¶ 7-9, 11-12 (sealed)
[123] *See id.* ¶ 10.

(1979) (concluding that the text, history, and purpose of Title IX "counsel implication of a cause of action in favor of private victims of discrimination").  *See also, e.g.*, *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 284-90 (1998); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992).

Jane Doe contends that responsible administrative officials at UNA were deliberately indifferent to the report of her sexual assault by Professor Dickerson, and failed to act reasonably in the light of the circumstances known to them.[124]  She contends that, as a result, she was "excluded from and denied participation in the educational opportunities provided by UNA."  Doc. no. 32 (Second Amended Complaint), ¶ 83.  Damages may be recovered by plaintiff only if she can prove that: (1) UNA is a recipient of federal funding; (2) an institutional official with authority to take corrective measures had actual notice of the sexual harassment or abuse; (3) the official responded with deliberate indifference; and (4) the deliberate indifference of that institutional official subjected the plaintiff to further discrimination.[125]  *See J.F.K. v. Troup County School District*, 678 F.3d 1254, 1255-56 (11th Cir. 2012); *Kocsis v. Florida State University Board of Trustees*, 788 F. App'x 680, 683-84 (11th Cir. 2019); *see also Davis v. Monroe County Board of Education*, 526 U.S. 629, 650

---

[124] *See* doc. no. 32 (Second Amended Complaint), ¶ 81.

[125] These four elements were presented by the court and agreed to by counsel in a hearing on February 28, 2020.  *See* doc. no. 99 (Hearing Transcript), at 7-8 (sealed).

(1999); *Gebser*, 524 U.S. at 290-92.

UNA does not dispute that it receives federal funding, or that an official with the authority to take corrective measures had actual notice of Jane Doe's allegations.[126]   Accordingly, the following discussion will address the questions of whether:  UNA acted with deliberate indifference; and, if so, whether that deliberate indifference subjected plaintiff to additional discrimination.

"The deliberate indifference standard is a high one."  *Doe v. Dallas Independent School District*, 153 F.3d 211, 219 (5th Cir. 1998).   Deliberate indifference occurs only when the official's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  *Davis v. Monroe County*, 526 U.S. at 648.  An institution's response is usually considered reasonable unless it amounts to "an official decision . . . not to remedy the violation." *Doe v. School Board of Broward County*, 604 F.3d 1248, 1259 (11th Cir. 2010) (citing *Gebser*, 524 U.S. at 290).  It is not enough for an institution merely to do *something*, if that something is unreasonable.  *See id*. at 1263.

Here, there is absolutely no evidence of deliberate indifference.  UNA officials began discussing an investigation and collecting contact information for the students who comprised the University's intercollegiate team as soon as a potential Title IX

---

[126] *See* doc. no. 116 (Brief in Support of Summary Judgment), at 35.

violation was reported.[127]  The Title IX Coordinator, Tammy Jacques, reached out to

the alleged victim in an attempt to schedule a meeting.[128]  Jane Doe cancelled that

meeting, however, and said she did not want to pursue an investigation.  Even so, Ms.

Jacques independently continued the investigation.[129]  Catherine White, the Deputy

Title IX Coordinator, interviewed the two male students who comprised half of

UNA's team to the intercollegiate competition, and attempted to contact the other

female team member.[130]  Ms. White and others also interviewed Professor Dickerson,

and issued him a verbal no-contact order that same day.[131]  After the interview with

---

[127] *See* doc. no. 115-32 (Tab Q - Declaration of Jerome Gafford), ¶¶ 1, 7; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶¶ 1, 4-5; doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶¶ 5, 7; doc. no. 118-4 (Tab E-3 - Exhibit 4 to the Deposition of Catherine White), at 2 (Nov. 24, 2015 Email from Dr. Beaver to Ms. Jacques, Ms. White, and Mr. Gafford, relaying her conversation with Gafford about the accusations) (sealed); *id.* at 3-6 (Exhibit 5 to the Deposition of Catherine White); doc. no. 118-3 (Tab D - Deposition of Catherine White), at 78, 91-94 (sealed).

[128] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 155 (sealed); doc. no. 118-2 (Tab C-2 - Exhibit 16 to Plaintiff's Deposition), at 50 (entry #5 on call log) (sealed); *id.* at 55-56 (Exhibit 18 to Plaintiff's Deposition); doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 8.

[129] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 156-57 (sealed); *id.* at 160 ("I decided ultimately that I wasn't going to meet with her."); *id.* at 184 ("Q.  Did you want the University or any of the individual defendants to force you to pursue your Title IX complaint?  A. No."); *see also* doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 10 ("I believed that in order to protect the student and perhaps other female students, I should move forward with my investigation despite her unwillingness to provide a statement.").

[130] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 117, 143, 167 (sealed); *see also* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 6.

[131] *See* doc. no. 118-9 (Tab E-6 - Exhibit 18 to the Deposition of Catherine White), at 9, 12 (Report of Meeting with Dickerson) (sealed); *see also* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 8; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 187 (sealed); doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶¶ 1, 3; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 8.

Dickerson, the members of the investigative team decided that Dr. Jana Beaver, the

Chair of UNA's Management and Marketing Department, should attempt to contact

Jane Doe, because of their belief that she might be more comfortable speaking with

someone with whom she was more familiar.[132]  Dr. Beaver interviewed Doe the next

day, but Doe said that she did not want Professor Dickerson "to lose his job over this;

she just wanted it to go away," and that she "did not want [UNA] to do anything and

did not want to press charges."[133]

On December 17, 2015 — a mere twenty-three days after the initial report of

possibly-inappropriate contact by Professor Dickerson with Jane Doe had been given

to Dr. Jerome Gafford by an unidentified student who had not attended the Orlando

competition — UNA placed Dickerson on administrative leave, banned him from

campus, issued a permanent no-contact order, and notified him that his contract of

employment would not be renewed for the subsequent academic year.[134]  Dickerson

thereafter returned to campus only once, to clean out his office under the supervision

---

[132] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 9; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 9; doc. no. 118-3 (Tab D - Deposition of Catherine White), at 175 (sealed); doc. no. 115-28 (Tab M - Declaration of Tammy Jacques), ¶ 17.

[133] Doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 21-22 (Report of Dr. Beaver's Interview with Jane Doe) (alteration supplied) (sealed); *see also* doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 13.

[134] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 14; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 20; *see also* doc. no. 118-16 (Tab J-1 - Exhibit A to the Second Declaration of Catherine White), at 2-5 (Dickerson Termination Documents) (sealed).

of the Dean of the College of Business.[135]

That series of events does not come close to the level of behavior detailed in the three cases in which the Eleventh Circuit found "deliberate indifference." *See Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015); *Doe v. School Board of Broward County*, 604 F.3d 1248 (11th Cir. 2010); *Williams v. Board of Regents*, 477 F.3d 1282 (11th Cir. 2007); *see also Stinson v. Maye*, No. 19-10815, 2020 WL 5015843 (11th Cir. Aug. 25, 2020) (reversing district court dismissal because plaintiff had sufficiently alleged a Title IX claim in the complaint). In each of those cases, there were known circumstances that put the school or university on notice prior to the incident in question. *See Hill*, 797 F.3d at 971-72 (a teacher's aide set up a "rape-bait" scheme to catch a student with a known history of sexual violence in the act); *Doe v. Broward County*, 604 F.3d at 1250-53 (plaintiff's complaint was the third sexual harassment complaint against the teacher within a three-year period); *Williams v. Board of Regents*, 477 F.3d at 1294-95 (the university actively recruited the student athlete despite knowledge of prior criminal history and complaints about sexual harassment and assault of women at other colleges); *see also Stinson*, 2020 WL 5015843, at *1 (assistant principal witnessed a female student being dragged into an abandoned building on school property by three male students).

---

[135] *See* doc. no. 115-30 (Tab O - Declaration of Greg Carnes), ¶ 7.

Here, UNA had no prior knowledge of any complaints against Dickerson. The background check conducted by the University prior to extending him an offer of employment turned up no criminal history.[136]   Further, the one complaint of inappropriate behavior lodged against Dickerson prior to the Orlando trip was not sexual in nature.[137] Moreover, once UNA officials were made aware of the possibility of inappropriate conduct, officials did not ignore the concerns.  Instead, the initial allegation was actively investigated, and the University's response was quick and effective.  In fact, the entire investigation was completed and Dickerson was placed on administrative leave in less than a month.[138]   In contrast, eight months elapsed between the complaint and disciplinary hearings in *Williams v. Board of Regents*, and another three months passed before the University took any corrective action. *See* 477 F.3d at 1296-97; *see also Saphir v. Broward County Public Schools*, 744 F. App'x 634, 638-39 (11th Cir. 2018) (finding no deliberate indifference where principal conducted investigation within two days of receiving notice and issued a no-

---

[136] Although no criminal history on Dickerson's background check, plaintiff alleges that a simple Google search would have pulled up an article about dropped sexual assault charges against Dickerson brought by his ex-wife. *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 219-23 (sealed).

[137] *See* doc. no. 118-3 (Tab D - Deposition of Catherine White), at 155-56 (sealed) ("I received information about a class where he was a guest lecturer and that he instructed about emergency preparedness in an unusual way.").

[138] *See* doc. no. 115-29 (Tab N - Declaration of Catherine White), ¶ 14; doc. no. 115-27 (Tab L - Declaration of Jana Beaver), ¶ 20; *see also* doc. no. 118-16 (Tab J-1 - Exhibit A to the Second Declaration of Catherine White), at 2-5 (Dickerson Termination Documents) (sealed).

contact order); *Sauls v. Pierce County School District*, 399 F.3d 1279, 1285-86 (11th Cir. 2005) (finding no deliberate indifference where school officials investigated the allegations by interviewing relevant parties); *Davis v. DeKalb County School District*, 233 F.3d 1367, 1373-75 (11th Cir. 2000) (finding no deliberate indifference where school officials conducted an investigation, interviewed relevant parties, ordered the alleged harasser to stay away from the alleged victim, and closely monitored the harasser's subsequent behavior).

Plaintiff's attempts to equate the circumstances of this case to those described in *Williams v. Board of Regents*, *Doe v. School Board of Broward County*, and *Hill v. Cundiff* fall far short of the mark. Plaintiff's main argument appears to be that the only reasonable action available to UNA was Dickerson's immediate termination. The Supreme Court has held, however, that Title IX does not require administrators to "engage in particular disciplinary action," nor are victims entitled to make "particular remedial demands." *Davis v. Monroe County*, 526 U.S. at 648. Instead, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *see also Clark v. Bibb County Board of Education*, 174 F. Supp. 2d 1369, 1374 (M.D. Ga. 2001) (holding that the question of whether the "Plaintiff was satisfied with the school's response to Recheze's harassment is of no moment; all that matters is whether it was clearly unreasonable under the

circumstances, and the Court has already concluded that it was not").

UNA made the decision to place Dickerson on immediate administrative leave, ban him from campus, forbid him from communicating with students during the interim, and not to renew his employment contract for another year because it believed that solution was the quickest way to protect Jane Doe and the other students who comprised the intercollegiate team, while not forcing them to undergo the additional stress and trauma of testifying.[139]  That decision was not clearly unreasonable, especially in light of plaintiff's clearly-stated desire not to make a statement or participate in the investigation.[140]

In summary, plaintiff has not shown that UNA acted with deliberate indifference, and her Title IX claim fails.[141]

## B.    The Equal Protection Claims Under 42 U.S.C. § 1983

Section 1983 does not create any substantive rights, but it has been construed as providing a remedy for deprivation of federal statutory or constitutional rights established elsewhere.  *See, e.g., City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816

---

[139] *See* doc. no. 115-26 (Tab K - Declaration of Kenneth Kitts), ¶ 3.

[140] *See* doc. no. 118-9 (Tab E-6 - Exhibit 24 to the Deposition of Catherine White), at 22 (Report of Dr. Beaver's Interview with Jane Doe) (sealed); *see also* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 184 (sealed) ("Q.  Did you want the University or any of the individual defendants to force you to pursue your Title IX complaint?  A.  No.").

[141] Because there is no finding of deliberate indifference, the court does not reach the issue of whether the alleged deliberate indifference caused plaintiff to suffer further discrimination.

(1985) (citing *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979)).  A *prima facie*

section 1983 claim requires plaintiff to show that she was (1) deprived of a "right,

privilege or immunity secured by the Constitution or laws of the United States, and

(2) that the act or omission [depriving her of said right] was done by a person acting

under color of law."  *Dollar v. Haralson County, Georgia*, 704 F.2d 1540, 1542-43

(11th Cir. 1983) (alteration supplied, citations omitted).

Significantly, "a plaintiff cannot assert a § 1983 action based on a violation of

Title IX."  *Williams*, 477 F.3d at 1300.  Accordingly, plaintiff instead contends that

the individual defendants violated the Equal Protection Clause of the Fourteenth

Amendment, because their "handling of her sexual assault claims caused her to lose

educational opportunities and . . . protected the assailant."  Doc. no. 32 (Second

Amended Complaint), ¶ 93 (ellipsis supplied).  The Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution provides that "[n]o State

shall . . . deny to any person within its jurisdiction the equal protection of the laws."[142]

---

[142] In full text, the first section of the Fourteenth Amendment provides that:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const., amend. XIV, § 1 (1868).

### 1. Plaintiff's individual capacity claims and the defense of "qualified immunity"

The individual defendants — *i.e.*, Dr. Kenneth D. Kitts, President of the University; Dr. Jana Beaver, Chair of the Department of Management and Marketing; Tammy W. Jacques, Title IX Coordinator; Catherine White, Assistant Vice President for Human Resources and Deputy Title IX Coordinator; Gregory A. Carnes, Dean of the College of Business; and, Dr. John Thornell, Vice President for Academic Affairs and Provost — all assert that they are entitled to "qualified immunity" from the claims asserted against them in their *individual capacities*.

The doctrine of qualified immunity protects government officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201

(2001).[143]  If that question is answered positively, the court will proceed to analyze the second aspect of the two-part inquiry:  *i.e.*, "whether the right was clearly established." *Id.*[144]

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question . . . is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff.  *Hope*, 536 U.S. at 739.  Instead, in order for

> a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what

---

[143] Any defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it is undisputed that all of the individual defendants were acting within the scope of their discretionary authority.  *See* doc. no. 116 (Brief in Support of Summary Judgment), at 63-64.

[144] The Supreme Court relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It is now within this court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be clearly established." *Id.* Under the circumstances of the present case, the court will assume that the first element is met in order to analyze whether any of the alleged constitutional violations are "clearly established" under the law.

he is doing violates that right.  This is not to say that an official action
is protected by qualified immunity unless the very action in question has
previously been held unlawful, *see Mitchell* [*v. Forsyth*, 472 U.S. 511,]
535 n.12 [(1985)]; but it is to say that in light of pre-existing law the
unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635,
640 (1987).

*Hope*, 536 U.S. at 739 (alterations in original).

As the Eleventh Circuit has observed, there are various ways in which a

reasonable official can be placed on "fair notice" that certain conduct is unlawful.

First, the words of the pertinent federal statute or federal
constitutional provision in some cases will be specific enough to
establish clearly the law applicable to particular conduct and
circumstances and to overcome qualified immunity, even in the *total
absence of case law*.  This kind of case is one kind of "obvious clarity"
case.   For example, the words of a federal statute or federal
constitutional provision may be so clear and the conduct so bad that case
law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for
example, the Fourth Amendment on its face, we then *turn to case law*.
When looking at case law, some broad statements of principle in case
law are not tied to particularized facts and can clearly establish law
applicable in the future to different sets of detailed facts.  *See Marsh* [*v.
Butler County, Alabama*], 268 F.3d [1014,] 1031-32 n.9 [(11th Cir.
2001)].  For example, if some authoritative judicial decision decides a
case by determining that "X Conduct" is unconstitutional *without tying*
that determination to a particularized set of facts, the decision on "X
Conduct" can be read as having clearly established a constitutional
principle:  put differently, the precise facts surrounding "X Conduct" are
immaterial to the violation.  These judicial decisions can control "with
obvious clarity" a wide variety of later factual circumstances.  These
precedents are hard to distinguish from later cases because so few facts
are material to the broad legal principle established in these precedents;

thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts*. That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original, alterations supplied). *See also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Plaintiff alleges that each defendant engaged in different conduct that violated her right to equal protection, so each will be addressed in turn.

### a.    Tammy Jacques, UNA's Title IX Coordinator

49

Plaintiff alleges that Title IX Coordinator Tammy Jacques violated her right to equal protection by (*i*) permitting the Chair of the Managing and Marketing Department, Dr. Jana Beaver, to conduct her interview, even though Dr. Beaver did not have Title IX training, and (*ii*) by not further investigating Professor Dickerson's sexual assault of plaintiff.[145]

Plaintiff relies upon a "Dear Colleague" letter issued to all school districts, colleges, and universities by the United States Department of Education, Office of Civil Rights on April 24, 2015, as support for her contention that there is a clearly established constitutional right to be interviewed by someone with Title IX training. That letter stated that "some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX."  Doc. no. 136 (Brief in Opposition to Summary Judgment), at 68.[146]  Plaintiff argues that letter provided UNA with fair warning of its obligations under Title IX.

A policy letter, however, does not serve the same purpose as a "materially similar case," or a "clearly established [legal] principle."  *Terrell v. Smith*, 668 F.3d

---

[145] *See* doc. no. 32 (Second Amended Complaint), at 14-15.

[146] The now rescinded letter can be found at the following website:  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf.

1244, 1255 (11th Cir. 2012); *see also Vinyard, supra*.   Further, UNA met the

obligations plaintiff highlighted from that letter:  that is, it had a designated Title IX

coordinator with sufficient training to oversee the investigation.  Furthermore, while

Ms. Jacques did not initiate a separate investigation of Doe's allegations of sexual

assault by Dickerson in his hotel room — an investigation that Doe said at the time

she did not want — Ms. Jacques did complete the initial investigation which found

that Dickerson "engaged in prohibited sexual contact with a student," and which

resulted in non-renewal of his employment contract.[147]  Accordingly, Ms. Jacques did

not violate any of plaintiff's clearly established constitutional rights.

### b.      Dr. Jana Beaver, Chair of UNA's Department of Management and Marketing

Plaintiff next alleges that Dr. Beaver violated her right to equal protection by

interviewing her without having Title IX training, not obtaining a written statement

from her as a product of the interview, and participating in the decision to not

immediately terminate Professor Dickerson.[148]  As discussed above, however, plaintiff

has no clearly established constitutional right to be interviewed by someone with Title

IX training.

Plaintiff has offered no evidence that she has a constitutional right to produce

---

[147] *See* doc. no. 118-5 (E-4, part 1 - Title IX Investigation Report), at 2-7 (sealed)

[148] *See* doc. no. 32 (Second Amended Complaint), at 15.

51

a written statement, or to determine the exact fate of her assaulter.  In fact, the leading case law states precisely the opposite.  *See Davis v. DeKalb County*, 233 F.3d at 1374 ("There is simply no reasonable basis to believe that the failure to obtain written statements or to record the meetings led to a failure to uncover relevant evidence or caused the investigation to be any less thorough."); *see also Davis v. Monroe County*, 526 U.S. at 648 ("[T]he dissent erroneously imagines that victims of [sexual] harassment now have a Title IX right to make particular remedial demands. . . . In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators.") (alterations supplied, citations omitted).

Further, Dr. Beaver cannot be held accountable for the decision to not immediately terminate Dickerson's employment, because she was not the final decisionmaker.  *See Kamensky v. Dean*, 148 F. App'x 878, 879 (11th Cir. 2005) ("A 'decisionmaker' is someone 'who has the power to make official decisions and, thus, be held *individually* liable." . . .  In the termination context, a 'decisionmaker' has the power to terminate an employee, not merely the power to recommend termination.") (quoting *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003)) (emphasis in original).

   c. **Catherine White, Assistant Vice President of the University's**

**Department of Human Resources and Deputy Title IX Coordinator**

Plaintiff alleges that Catherine White violated her right to equal protection by failing to conduct a thorough background search of Dickerson prior to offering him a contract of employment, "not only [looking for] convictions but [also determining whether] he had ever been *charged* with a crime."  Doc. no. 32 (Second Amended Complaint), at 15 (alterations supplied, emphasis in original).  Plaintiff has presented no evidence that UNA had to go beyond its legal obligations in conducting a background check to search for *charges* that were either withdrawn or did not result in a conviction.  In fact, in *Williams v. Board of Regents*, the Eleventh Circuit held that the school did not violate the plaintiff's constitutional right by recruiting an individual it *knew* to have a history of sexual assault and criminality.  477 F.3d at 1301 ("Williams has failed to present any cases that show the three defendants violated her clearly established equal protection rights by recruiting and admitting an individual like Cole.").  Here, UNA conducted a thorough background investigation, but did not uncover the charges for sexual assault that had been filed against Dickerson by his ex-wife, but dismissed prior to trial.[149]  Plaintiff does not have a constitutional right to require the school to conduct research beyond the standard

---

[149] *See* doc. no. 118-1 (Tab B - Plaintiff's Deposition), at 220-23 (sealed).

53

background check.

Plaintiff also alleges that Ms. White violated her right to equal protection by improperly labeling the actions of Dickerson as a "University Policy Issue" rather than a "Title IX Issue"; permitting Dr. Beaver to conduct plaintiff's interview; and participating in the decision to not immediately terminate Dickerson.[150] As discussed in preceding paragraphs, however, none of these allegations constitute violations of clearly established constitutional rights.

### d.   Dr. Gregory Carnes, Dean of UNA's College of Business, and Dr. John Thornell, Vice President for Academic Affairs and University Provost

Plaintiff alleges that Drs. Gregory Carnes and John Thornell each violated her right to equal protection by participating in the decision to not immediately terminate Dickerson.[151]   As previously discussed, however, plaintiff has no right to make specific remedial demands, and, non-decisionmakers cannot be held liable. *See Davis v. Monroe County*, 526 U.S. at 648; *Kamensky*, 148 F. App'x at 879.

### e.   Dr. Kenneth D. Kitts, UNA President

Finally, plaintiff alleges that Dr. Kenneth Kitts violated her right to equal protection by deciding to not immediately terminate Dickerson, and by approving

---

[150] *See* doc. no. 32 (Second Amended Complaint), at 15-16.

[151] *See id.* at 16.

UNA's statement about this lawsuit and, thereby, discouraging other potential victims from coming forward.[152]  While Dr. Kitts *was* the final decisionmaker and, therefore, could be held liable under *Kamensky*, the decision to not immediately terminate Dickerson did not violate plaintiff's constitutional rights, because she does not have a right to choose her own remedy.  *See Davis v. Monroe County*, 526 U.S. at 648. With regard to UNA's official statement on this lawsuit, plaintiff has presented no evidence of any right of which that statement deprived her.

As demonstrated, none of the individual defendants violated clearly established constitutional rights.  Therefore, they are entitled to qualified immunity for any money damages sought by plaintiff.

### 2.    Plaintiff's official capacity claims under section 1983

The doctrine of qualified immunity does not prevent plaintiff from seeking under section 1983 prospective injunctive relief from the individual defendants in their official capacities.  Plaintiff framed her demand for such relief as follows:

> Doe seeks prospective relief to stop the current policies and procedures which discourage students who have been sexually assaulted or harassed from seeking justice through UNA's Title IX office.  Doe seeks prospective relief to stop the policies and procedures that allowed the individually named defendants to choose their own self-interest over the interest of protecting Doe, other female students and violations for the equal protection of a female's right to be free from gender

---

[152] *See id.* at 17-18.

discrimination under the law.  Doe requests the Court issue a mandatory injunction ordering UNA to refrain from unlawful discrimination and/or retaliation as described herein, ordering UNA to undertake and rectify any and all Title IX violations and/or inequities, ordering UNA to refrain from creating and condoning a hostile sexual harassment and/or discriminatory environment against individuals on the basis of sex by immediately ceasing deliberate indifference to sexual harassment and sexual assaults, cease supporting and/or maintaining employees accused of sexual harassment and sexual assault and rape upon their students and to stop fostering an environment which condones teacher on student sexual misconduct.

Doc. no. 32 (Second Amended Complaint), ¶ 101.  That portion of plaintiff's complaint stating her prayers for relief frames, more concisely, the prospective injunctive relief that she seeks:  *i.e.*,

> C.    An Order enjoining UNA, along with all of its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment.

> D.    Injunctive relief requiring UNA to redress its violations of Title IX; including:  1) adoption of a "zero tolerance" policy under which there will be mandatory investigations into any allegations of sexual harassment and sexual assault by an employee upon a student.

*Id.* at 22.

Defendants argue that plaintiff does not have standing under section 1983 to seek such injunctive relief, because her requests amount to nothing more than an order to "obey the law," which is invalid and unenforceable.  *See Securities and*

*Exchange Commission v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (collecting cases in which the Eleventh Circuit invalidated "obey the law" orders).

Article III requires a plaintiff to meet three standing requirements: (1) injury-in-fact; (2) a causal connection between the injury-in-fact and the challenged action of the defendant; and (3) redressability — *i.e.*, that a favorable decision will address plaintiff's injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In *Williams v. Board of Regents*, 477 F.3d at 1302-03, the Eleventh Circuit found that a similar prayer for relief did not meet the standing requirements, in part, because the assailant was no longer at the school (which also is the case here); and, therefore, that any future harm the request allegedly relieved was too speculative.

Even interpreting plaintiff's responsive arguments generously, it appears that she contends the relief is not too speculative, and that a grant of the relief she requests would not amount to an "obey the law" order, because there are demonstrable failures in UNA's reporting of sexual violence into the Title IX tracking system because the Title IX coordinators are not effectively trained in how to utilize the Advocate Tracking System.[153] She provides no evidence of the alleged failures, however, and this court finds that any proposed relief is too speculative. Therefore, plaintiff does not meet the redressability requirement, and does not have standing to seek

---

[153] *See* doc. no. 136 (Brief in Opposition to Summary Judgment), at 69-70.

prospective injunctive relief under 42 U.S.C. § 1983.

## III. CONCLUSION

For all the reasons stated above, the defendants' motion for summary judgment is due to be granted, and all of plaintiff's claims dismissed. A separate Order consistent with this memorandum of opinion will be entered contemporaneously herewith.

**DONE** this 15th day of October, 2020.

_____
Senior United States District Judge

58